**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**HUGO MARTIN RECINOS-RECINOS, ET AL**                    **CIVIL ACTION**

**VERSUS**                                                                            **NO. 05-1355**

**EXPRESS FORESTRY, INC., ET AL**                               **SECTION  "I" (3)**

**ORDER AND REASONS**

On June 28, 2006, the matter of Plaintiffs' Renewed Motion for Contempt, Sanctions and

to Compel [Rec. Doc. No. 125] came on for hearing before the undersigned Magistrate Judge,

following which the motion was taken under advisement.  For the following reasons, plaintiffs'

motion is GRANTED IN PART.

**BACKGROUND**

On April 7, 2005, class representatives, Hugo Martin Recinos-Recinos, Pablo Alvarado-

Recinos and Alberto Alvarado, filed the captioned class action lawsuit.  The collective/class

action alleges that during the plaintiffs' and putative class members' employment with

Defendants, Express Forestry, Inc., Rick Thomas and Sandy Thomas, they systematically

violated the Agricultural Worker Protection Act (AWPA), 29 U.S.C. § 1801, and the Fair Labor

Standards Act (FLSA), 29 U.S.C. §201.   The action was brought on behalf of a class of over 300

predominantly Guatemalan and Mexican migrant workers who planted trees and performed other

forestry-related tasks for the defendants seasonal business.

1

Defendants operate a tree-planting service, in which they bid on and negotiate contracts to plant trees on land owned by other individuals and companies.  To fill manpower requirements for the contracts, they imported foreign nationals to perform forestry work on a seasonal or temporary basis, in accordance with the Immigration and Nationality Act.[1]  Each of the plaintiffs  were issued an "H-2B visa" as contemplated by the aforesaid Act.  Plaintiffs allegedly spent considerable sums to process visas and travel to the United States.  In some cases, the plaintiffs were required to pledge collateral in the form of a deed to their land as a condition of being hired.  Plaintiffs allege that the defendants allegedly have not returned the documents.

As a condition for obtaining the visas for the plaintiffs, defendants certified to the United States Department of Labor that the wages paid the plaintiffs would equal or exceed the applicable prevailing wage, and that the job would not contravene Federal, State or local law, including the applicable requirements of the H-2B program as set forth in the regulations.  Under the applicable law, plaintiffs were entitled to receive a prevailing hourly wage and overtime pay but, according to the allegations, defendants took full advantage of their indigence, inability to speak the English language  and lack of understanding of the law and grossly underpaid them as H-2B forestry workers.   Pursuant to the opt-in collective action provisions of the FLSA, thirteen of the defendants' former employees have filed written consents-to-sue, indicating publicly their intention to join this action.

---

[1]*See* Declaration of Sandy Thomas at ¶ 3 ("Due to the unavailability of employees for this seasonal work in the United States, Express Forestry, Inc., hires workers from other countries and secures H-2B visas that allow them to come to the United States and work for our company.") [Rec. Doc. No. 52]; Declaration of Rick Thomas  at ¶ 3 (same) [Rec. Doc. No. 52].

Plaintiffs seek restitution of unpaid wages, monetary damages and declaratory and injunctive relief.  Plaintiffs allegations include that defendants' record-keeping was inadequate, inaccurate, false and misleading.   Plaintiffs further alleged that defendants failed to pay minimum wage and the proper prevailing wage for the work performed in violation of AWPA, as well as overtime for hours worked in excess of a forty hour week.  Additionally, plaintiffs' claim that defendants failed to reimburse plaintiffs for expenses they incurred primarily for the benefit of defendants in violation of the FLSA.  As a result, plaintiffs seek to recover unpaid minimum and overtime wages, plus an additional amount in liquidated damages pursuant to 29 U.S.C. § 216(b)  The plaintiff class consists of all those individuals admitted as H-2B temporary foreign workers, who were employed in any capacity by the defendants from April of 1999 until the date of filing the present action (April 7, 2005).

On November 30, 2005, the Court granted Plaintiffs' Emergency Motion for Protective Order in part – *i.e.*, insofar as it sought to enjoin defendants and their agents from unilateral communications with plaintiffs, opt-in plaintiffs, potential plaintiffs and/or their families regarding the captioned litigation.[2]  No sanctions were imposed because it was not clear that the campaign abroad to coerce plaintiffs, opt-in plaintiffs and potential class plaintiffs to withdraw their pending claims was perpetrated, orchestrated or instigated by defendants' agent, Express Forestry Manager/Recruiter Leo Salazar.   In this regard, defendants vehemently denied any participation in the incidents which took place in Santiagopetatan and argued that **an indeterminate group of individuals** apparently *took it upon themselves* in September of 2005 to

---

[2]*See* Minute Entry Order dated November 30, 2005 [Rec. Doc. No. 81]; Memorandum Opinion and Protective Order signed January 23, 2006 [Rec. Doc. No. 93].

visit certain named and opt-in plaintiffs and/or their family members to try and talk them out of prosecuting this lawsuit, which they believed not to be in their community's best interest.[3]

On December 19, 2005, plaintiff's motion to compel was granted and the defendant was ordered to supplement its response to plaintiff's discovery requests.[4]   The order addressed plaintiff's written discovery requests propounded in July, 2005, which had remained outstanding for months.  On January 30, 2005, the district judge granted Plaintiffs' Motions for Class Certification and for Preliminary Certification of Collective Action.[5]  It is noteworthy that defendants' did not oppose provisional certification of plaintiff's collective action.

On February 13, 2006, Plaintiffs filed their first Motion for Contempt and/or Sanctions, noting that defendants had failed to produce (1) any records related to plaintiffs and opt-in plaintiffs' fellow crew members and crew leaders, with the exception of a three page check history for one crew lease and five pages of check histories for three crew members, (2) any names and addresses of Plaintiffs' and Opt-In Plaintiffs' fellow crew members, (3) any records whether pre- or post-Hurricane Katrina, for Plaintiffs' and Opt-In Plaintiffs' fellow crew members, crew leaders, or records for Opt-In Plaintiffs (other than Domingo Aguilar) that shows their hours purportedly worked, their piece rate production and/or gives any indication of how earnings were determined.  At that point, Sandy Thomas' deposition was imminent, supervisors' depositions were set to commence in two weeks and plaintiffs were without the most basic accounting/pay record documents necessary to productively engage in deposition discovery

---

[3]*See* Memorandum Opinion (restating defendants' contentions) [Rec. Doc. No. 93].

[4]*See* Minute Entry Order dated December 19, 2005 [Rec. Doc. No. 87].

[5]*See* Order dated January 30, 2006 [Rec. Doc. No. 94].

regarding their FLSA claims, *inter alia*.

On February 16, 2006, plaintiff's Motion for Contempt/Sanctions and to Compel was granted in part.  The defendants were ordered to provide post-Katrina records for one complete crew, plaintiffs to select the crew by crew leader randomly, as a sample.   Such random sample discovery was necessitated by **defendants' representations to the Court** and to the plaintiffs that:

> (1) Express Forestry Company's  **pre-Katrina paper records were destroyed** by the hurricane;[6] and
> (2) Express Forestry Company's **pre-Katrina computer generated records have been overwritten and the data comprising pre-Katrina computer generated pay stub information, etc., is irretrievable** according to the defendants' system's specialist.[7]

The Court further issued an order allowing plaintiff to procure a computer expert to examine the defendant's computer system and investigate whether any pre-Katrina data which has been "overwritten" is retrievable.  The defendants were also ordered to afford plaintiffs' computer expert access to the computer system.[8]

On  March 2, 2006, the Court granted Plaintiffs' Motion to Extend the Protective Order [Doc. #99], restricting defendants' communications with putative class members. On March 16, 2006, the parties' stipulated protective order issued regarding electronic data discovery retrieved

---

[6]*See* Defendants' Opposition to Motion for Emergency Protective Order at p. 8 ("As stated in Defendants' Declarations, Hurricane Katrina utterly demolished a house in Ocean Springs, Mississippi owned by Defendants Rick and Sandy Thomas where Express Forestry's business records had been stored.") [Rec. Doc. No. 52].

[7]*See* Minute Entry Order dated February 16, 2006 at p. 2 ¶ 1 (reiterating defendants' representations to the Court regarding the availability of documentary and electronic data discovery critical to the plaintiff's prosecution of this action) [Rec. Doc. No. 102].

[8]*Id.* at ¶ 2.

by plaintiffs' independent computer consulting firm on February 23, 2006.[9]  On April 18, 2006,

plaintiff's filed a motion seeking leave to assert new class action theories of recovery and to

assert a violation of the MSPA, which was granted pursuant to a contradictory hearing.[10]

On May 25, 2006, plaintiffs filed the subject Renewed Motion for Contempt and

Sanctions which defendants opposed.

### PLAINTIFF's RENEWED MOTION FOR SANCTIONS

Plaintiffs contend that sanctions are necessary to address defendants' persistent and

continuing failure to produce available records,  efforts to deprive plaintiffs of their right to make

an uncoerced decision about whether to participate in this lawsuit and to receive timely class

notice and continuing false, evasive and misleading statements to plaintiffs and this Court

concerning the availability and existence of key documents and witnesses.[11]

Defendants submit that they have produced all relevant documents, both electronic and

hard copy, and in several instances produced a broader range of documents than ordered by the

Court or requested by plaintiffs.  Defendants categorically deny suggesting that their supervisory

personnel destroy their own personal records in an attempt to hinder plaintiffs' prosecution of

this case and note that they recently produced personnel files for H-2B employees for the 2005

planting season, which they mistakenly believed did not contain relevant information.[12]

---

[9]*See* Agreed Order executed March 16, 2006 [Rec. Doc. No. 110].

[10]*See* Minute Entry Order dated May 10, 2006 [Rec. Doc. 119].

[11]*See* Plaintiffs' Renewed Motion for Contempt, Sanctions and To Compel Responses to Plaintiffs' Discovery [Rec. Doc. No. 25]; Plaintiffs' Reply Memorandum [Rec. Doc. No. 145].

[12]*See* Defendants' Memorandum in Opposition to Renewed Motion for Contempt [Rec. Doc. No. 134].

**EVIDENCE WARRANTING THE IMPOSITION OF SANCTIONS**

As to Plaintiffs' Requests for Production and Interrogatories issued July 28, 2005, pursuant to the first hearing on plaintiffs' motion to compel, defendants were ordered to respond to substantial portions of plaintiffs' discovery requests, including production of records indicating the hours worked, piece work performed and other information related to the calculation of pay for named/opt-in/putative class plaintiffs, their fellow crew members and foremen.[13]

In response to this Court's order, defendants produced check history printouts indicating *lump sum payments* to workers.[14]   These printouts omit the most significant information concerning how the individual worker's pay was determined, such as the hours worked, the amount of piece work performed by the worker and the pay rate.  On multiple occasions, defendants represented to plaintiffs and this Court that, other than these lump sum printouts, no payroll data was available.[15]

On February 13, 2006, plaintiffs filed their first Motion for Contempt .  At the February 6, 2005 hearing, the Court ordered defendants to allow plaintiffs reasonable access to defendants' computer system so that plaintiffs' expert could determine whether pre-Katrina employment data is retrievable.  Plaintiffs' expert retrieved  thousands of pages of relevant data that clearly should have been produced earlier pursuant to the Court's December 19, 2005 order,

---

[13]*See* Minute Entry Order dated December 19, 2005 [Rec. Doc. No. 87].

[14]*See* Express Forestry Check History-Summary [Plaintiffs' Exhibit 11].

[15]*See* Deposition of Sandy Thomas taken February 22, 2006 (testifying that you [plaintiffs] asked for payroll records, I gave you this and, as to hours worked, "the machine does not keep that") [Plaintiffs' Exhibit 12].

to wit:

 (1) extensive records concerning plaintiffs' piece rate production; (2) the rates at which plaintiffs were allegedly paid;  (3) the character of deductions from plaintiffs' pay; (4) the type of work being performed; (5) spreadsheets of hours worked; (6) prevailing wages; and (7) other data related to specific crews, many of whom were headed by crew foremen for whom plaintiffs worked.[16]

Pursuant to the Court's January 30, 2007 order on class certification, defendants provided plaintiff with a paper spreadsheet purporting to be the H-2B worker names ordered produced by the Court.  *See* List of H-2B worker names and addresses provided by Defendants [Plaintiff's Exhibit. 28 ].  Plaintiffs discovered that the list was riddled with major errors.  Approximately 35% of the addresses were so incomplete or obviously inaccurate that Plaintiffs could not use them at all.  The list did not contain postal codes for any of the workers and, in some cases, addresses that were located in Mexico were listed as being in Guatemala, or vice versa.

Data unearthed by plaintiffs' computer expert also included some data bases of employee names and contact information.  After analyzing the data, plaintiffs discovered that the contact information for at least 106 Mexican and Guatemalan H-2B employees had been omitted from the list of names and addresses produced in February, 2006.  Plaintiffs were then forced to send a delayed second round of notices to these individuals.  The total cost of computer experts' services incurred by plaintiff  in their quest for relevant discovery amounted to $9,544.24.  *See*

---

[16]*See* Sample Electronic Data extracted by plaintiffs' computer expert (illustrating the type of details pertaining to workers' pay, character of deductions, *inter alia*, i.e.,available electronic data responsive to plaintiffs' July, 2005 discovery requests and Court ordered discovery) [Plaintiffs' Exhibits 21-22].

Notice of Filing Documentation of Attorneys' Fees and Costs filed July 3, 2006 and attachments [Rec. Doc. No. 148-1, 148-6 and 148-7].

Plaintiffs' depositions of Defendants' payroll clerk, as well as Defendants' subsequent production of pay stubs from the 2005 season, revealed that the Defendants did not take all personnel and pay related documents with them from their Arkansas office to the Gulf Coast prior to Hurricane Katrina as they had previously maintained.   Express Forestry's payroll clerk, Sheryl Puckett ("Puckett"), testified that only a few documents were taken to the defendants' Mississippi beach house prior to Katrina.   Puckett estimated that records removed by the Thomases amounted to "one file drawer" or less.[17]    It is simply impossible to square Puckett's testimony with defendants' claim of sweeping records destruction in the wake of  Hurricane Katrina.[18]   Defendants did in fact belatedly produce the 2005 paystubs for Martin Aquilar-Sales, who opted in weeks after Katrina, but not for any other plaintiff who opted in after Katrina.  Sandy Thomas herself  testified: "Looks suspicious, doesn't it?"[19]

Puckett  testified that detailed pay data was at all times accessible to defendants electronically; however, the only information she was directed or instructed to retrieve for

---

[17]*Compare* Deposition Transcript of Sheryl Puckett taken March 3, 2006 at p. 92 [Plaintiffs' Exhibit 13] *with* Deposition Transcript of Sandy Thomas dated February 22, 2006 at pp. 201, 202 and 216  (stating that, after service of the captioned lawsuit in the summer months prior to August 29, 2005, she took three loads of documents in three different trips to their Mississippi house – *i.e.*, "cleaned out the file drawers") [Defendants' Exhibit 2].

[18]*See* Defendants' Opposition to Motion for Emergency Protective Order at p. 8 and Declarations of Rick and Sandy Thomas [Rec. Doc. No. 52].

[19]Sandy Thomas' Deposition at p. 218.

9

disclosure was detailed, lump sum check histories.[20]  Puckett testified that she could run a report

with all of the information that the plaintiffs wanted for a particular time frame (2001) and for a

particular crew, but that she was never asked for that and was given the impression that she just

needed to run the totals.[21]

Depositions of defendants' supervisors revealed that Express Forestry failed to take steps

to preserve relevant and available records kept by plaintiffs' supervisors and  failed to disclose or

identify all supervisors who worked for defendants during the relevant time period. Regarding

defendants' failure to take steps to preserve relevant written records, Paolino Rosas testified that

no one told him in May of 2005 to keep his notebooks where he wrote down information about

the crew and that he threw away last season's notebook. [Plaintiffs' Exhibit 15].  Isaac Perez

testified he had a current notebook with him since he always keeps it in the van; however, he

throws away the notebooks at the end of the season and no one ever told him to keep it.

[Plaintiffs' Exhibit 16].  Similarly, Rodolfo Martinez testified he used notebooks but he could

not remember what he did with them.  No one told him to save the notebooks where he had

recorded worker information.  [Plaintiffs' Exhibit 17]. Nicholas Flores also testified that he kept

notebooks and used the information from the notebook to fill out the weekly crew sheet.  He did

not keep them and the company never asked him to save them. [Plaintiffs' Exhibit 18].

---

[20]Sheryl Puckett Deposition at pp. 55-57 (noting that (1) Sandy Thomas simply asked for
"all of the information for the workers for their pay," (2) as to units planted and sprayed Puckett
answered "No" meaning that Sandy did not ask for that information, and (3) Puckett
acknowledged that she could generate a report with the information sought by the plaintiff  but
did not because she was not ask to do so by Sandy Thomas).

[21]*Id*. at pp. 79-81 (admitting that she had never been asked to run a report for period in
question with the specific information requested by plaintiffs regarding the workers in this case).

In sum, notwithstanding defendants' report of sweeping records destruction in the wake of Katrina, the record reveals that none of the supervisors were ever instructed to save any of their hand-written documentation or information regarding tree-planting work performed during the pertinent years, which had not been carted off to the Gulf Coast during the height of hurricane season.   Supervisors produced only a few slim spiral bound notebooks, none of which contained information for the period prior to the 2005-06 planting season.  Plaintiffs' position is that the notebooks had obviously been purged.  Most notably,  Leo Salazar's two 70 page spiral bound notebooks contained only 19 and 26 pages, respectively.

It is also now clear that defendants falsely denied any connection/complicity with the September, 2005 conduct of former employees/supervisors and their own manager in the village of Santiagopetatan and elsewhere, attempting to coerce named/opt-in and putative class plaintiffs to withdraw their claims in this lawsuit.  At the November 30, 2005 hearing, defendants characterized the perpetrators as *an indeterminate group of individuals*[22] who apparently *took it upon themselves*[23] in September of 2005 to visit certain named, opt-in plaintiffs and/or their

---

[22]Unsurprisingly, after the car trip (eight hours each way), these erstwhile *indeterminate* individuals (purportedly acting alone) were easily identified in deposition by Leo Salazar as Audel de Leon, Isaac Perez, Mauricio and Jacinto. *See* Deposition Transcript of Leo Salazar taken on March 2, 2006, at pp. 96-97 [Plaintiffs' Exhibit 26].

[23]*See* Defendants' Opposition to Plaintiffs' Motion for Emergency Protective Order, at p. 4, arguing that:

> Defendants cannot be penalized if other individuals, even those who may have in the past have worked for the Defendants, take it upon themselves to visit named or opt-in plaintiffs or their family members to try and talk them out of what they may perceive as conduct that is not in the community's best interest.  The actions of individuals who have no ties to Defendants and are not subject to their direction or control cannot be attributed to them, nor can Defendants be expected to control such individuals. [Rec. Doc. No. 52].

family members to try and talk them out of prosecuting this lawsuit.  It is now clear that Express

Forestry Manager/Recruiter Leo Salazar accompanied these individuals (identified in deposition

by Salazar) on an eight-hour car ride from Guatemala City to the village of Santiagopetatan.

Salazar  was dispatched to Guatemala City on company business by defendants (Rick

Thomas/Express Forestry – previously characterized as a small "mom and pop" corporation

arguably incapable of orchestrating such a campaign from their corporate headquarters in

Arkansas).  Salazar testified that he flew from Little Rock, Arkansas through Houston and

Mexico to Guatemala City.  After arriving in Guatemala City, he was met by four or five

individuals (four of whom were named and not indeterminate).  Salazar accompanied them on a

six hour car ride to Hueheutenango and then further "down the road" two hours to the town of

Santiagopetatan in search of named class representative, Hugo Recinos-Recinos.  Salazar

testified that he accompanied the workers to Hugo's house both times but stayed in the car and

let the workers do the talking for him.[24]   In this regard, Salazar testified:

> Q.    And Rick [Thomas] didn't talk to you about what you should say to
>       people?
> A.    No.  But just – he just told be to go and talk to our people, they – make
>       sure they don't get hysterical.  We just got to bring them in.
> Q.    Okay.  What did you tell the workers about the lawsuit?
> A.    As far as I knew, I'd say to them, "Oh, we might be in trouble."  That's
>       what I said, "We might be in trouble with the embassy, and its going to be
>       hard to get people from – Guatemala."  That's what I said.
>                                    * * *
> Q.    Why do you think that Hugo was getting Express in trouble?
> A.    Because I think probably Rick [Thomas] told me or somebody told me
>       me.
>                                    * * *
> Q.    Okay.  So the purpose in going to talk to Hugo was to convince

---

[24]*See id.*, at pp. 97-102 [Plaintiffs' Exhibit 26].

             him not to make trouble for the company?

A.      You could say that.

Q.      Okay.  And did you try to convince other people not to make trouble for the company, besides Hugo?

A.      I never say that to them, but it just – it just obvious to – we – we don't – if  we working, I mean, you don't want trouble with your company or whatever....

Q.      So you wanted people not to join the lawsuit.

A.      I think you could say yeah.

Q.      Okay.  And you wanted to get Hugo to withdraw the lawsuit.

A.      Probably talk to him and see what – what he thinks....[25]

Defendants' argument at the November 30, 2006 hearing on plaintiffs' motion for

protective order stands in stark contrast to the facts detailed above by Salazar, to wit:

> **COUNSEL**: Fundamentally, it appears that the Motion for Protective Order breaks into three parts.  One [is] the events that occurred in Guatemala and from the Defendant's point of view, we haven't disputed the actual conversations because we weren't part of them and we condemn them as much as plaintiffs do.  The issue has always been whether it was our folks or our agents....
>
> **THE COURT**:  Well, who is Mr. Salazar?
>
> **COUNSEL**: Mr. Salazar is a manager with this small company [Express Forestry] ...
>
> **THE COURT**: Was he there [meaning was he there in Santiagopetatan]?
>
> **COUNSEL**:  He [Leo Salazar] was not there and he denied it in his affidavits that he was present during those conversations....
>
>                            *  *  *
>
> **THE COURT**: So basically, your version is that these people just got together without anybody from the company saying anything to them and they just went and visited these people?
>
> **COUNSEL**:  I think the only thing that the employees understood was there was a lawsuit against the company and it was causing problems for the company and it scared them because their economic livelihood – the economic dependency – [] the towns are dependent on it.  *There is nothing in there that really shows that this small company did anything, this orchestration of a campaign from a small mom and pop operation from Arkansas in a foreign country is  kind of hard to –*
>
> **THE COURT**: **Well, you would agree with me that if Mr. Salazar was there, it would be a different story, right?**

---

[25]*Id.*, at pp. 112-118; *see also id.*, at p 101 ("[W]hen I said that Hugo was maybe causing trouble ... they wouldn't go.  And I said, 'Well, let's go, you know.'"); *id.*, at 102 (admitting that he went to Hugo's house twice but he stayed in the car).

**COUNSEL:  Right**.[26]

Most notably, on March 1, 2006 (the day before Manager/Recruiter Leo Salazar's video-

deposition), defendants filed their response to Plaintiffs' Motion to Extend the Protective Order[27]

enjoining defendants' communications with class plaintiffs about the lawsuit outside confines of

discovery, stating that they had no objection.[28]   Because the extension of the aforesaid protective

order presently in effect has proved to be sufficient for the purpose of curbing/discouraging any

further abuse by the defendants and/or their agents, the Court has determined that no further

restrictions regulating defendants' communications with plaintiffs, potential plaintiffs and/or their

families are warranted.

Turning to defendants' inexcusable delay of the discovery process, during the week of May

15, 2006, defendants' finally produced approximately 700 pages of 2005 pay stubs (all of which

had been previously reported destroyed by Katrina).   The Court previously ordered the production

of these documents in its discovery order dated December 19, 2005 discovery order – *i.e.*,  pay

information that pertained to individuals who were in the same crews as the plaintiffs and opt in

plaintiffs.   The delinquent production of hundreds of pages of missing pay stubs did not include

so much as one pay stub for a single opt in plaintiff– *i.e.*, even for those who opted in after Katrina.

---

[26]*See* Transcript of November 30,  2005 hearing on plaintiffs' Motion for Protective
Order at p. 57 (italicized and bolded emphasis added) [Rec. Doc. No. 11].

[27]*See* Plaintiffs' Motion for Extension of Protective Order  [Doc. No. 99].

[28]*See* Defendants' Response to Plaintiffs' Motion to Extend the January 23, 2006
Protective Order [Rec. Doc. No.  106]; Order dated March 2, 2006 (granting Plaintiff's Motion
to Extend Protective Order as unopposed and cancelling the March 8, 2006 hearing) [Rec. Doc.
No. 107].

Plaintiffs suggest that the absence of any pay stubs for opt-in plaintiffs from the belated production should not be passed off as mere coincidence.

Defendants failure to preserve documents and to timely produce available documents and information has caused the plaintiffs to incur extraordinary discovery expenses, including the expense of hiring its own expert to engage in electronic data retrieval (based upon defendants' representation that the information sought by the plaintiffs was <u>not</u> retrievable) and the prosecution of three motions to compel, two of which also sought sanctions for contempt.  The defendants' belated production of responsive discovery effectively delayed deposition discovery until the end of the planting season, when the departure of plaintiffs' supervisors  was imminent.  Deposition discovery was accomplished without the benefit of documentary discovery that was readily available *but not produced by defendants*.[29]

Had defendants timely disclosed the identities and contact information regarding all crew foremen during the pertinent time frame, plaintiffs would have been in a position to compel depositions of Express Forestry's foremen/supervisors *before* they departed the United States. Now plaintiffs must incur the expense of discovery abroad.   In this regard, the record reflects that six of the seven supervisors not disclosed by defendants no longer work for Express Forestry. Defendants still have not provided contact information regarding twelve now-disappeared supervisors, placing plaintiffs at a serious disadvantage late in the discovery process.

---

[29]*See* Email dated March 12, 2006 (noting the absence of documents concerning pay and hours spraying, paystubs, inter alia) [Doc. #145-2/Plaintiffs' Exhibit 44]; Deposition Transcript of Refugio Chavez taken March 15, 2006 at pp. 68-71 (colloquy discussing the incomplete production of payroll records and noting that the deposition would be held open in light of the deficient production of payroll records) [Doc. #145-2/Plaintiffs' Exhibit 43].

The Court is not persuaded by defendants' argument that it was functionally impossible to determine which H-2B employees worked on the same crews with electronic data alone.  Record evidence reveals that crew members on the same crew  were assigned a common "pay group" number, which identifies the supervisor of the particular crew.[30]   Express Forestry's payroll clerk, Puckett, testified that crew members on the same crew were assigned a common "pay group" number, which serves as an easy means of identifying those who worked on the same crews and the supervisor.  Puckett demonstrated that all she needed to do was examine the crew number and she could identify the supervisor.[31]  Notwithstanding the foregoing, defendants' January 16, 2006 supplemental discovery response stated that defendants no longer possess records related to crew members and crew leaders for purposes of responding to plaintiffs' Interrogatory No. 1 and corresponding Request for Production.   Defendants' production of the records of Obin Castillo Matiaz – purportedly the only individual that Express Forestry could determine was a crew leader of Named and Opt-In plaintiffs over the pertinent period – is clearly insufficient considering that the requested information and documents were in the defendants' possession and control all along.

Pursuant to the Court's February 13 and 16, 2006 orders, defendants produced post-Katrina records for one crew and granted plaintiffs' access to  Defendants' electronic hard drive.  Lest there be no mistake, electronic data discovery was court-ordered.  As aforestated, defendants represented to this Court that Express Forestry Company's **pre-Katrina computer generated**

---

[30]*See* Express Forestry Pay Stub dated February 2, 2005 (Pay Group: 44)  [Doc. # 145-1/ Plaintiff's Exhibit 38].

[31]*See* Puckett Deposition at pp. 48-50 (identifying crew leader Obin [Castillo], crew leader for Crew 44/Pay Group 44) [Doc. #145-2/Plaintiffs' Exhibit 40].  *See also* Deposition of Sandy Thomas at p. 44 [Doc. # 145-1/Plaintiffs' Exhibit 39].

**records have been overwritten and the data comprising pre-Katrina computer generated pay stub information, etc., is irretrievable** <u>according to the defendants' system's specialist</u>.[32] Whereas, the defendants argue that they are entitled to some credit because court-ordered electronic data discovery exceeded the scope of discovery (*i.e.*, plaintiffs' computer expert was allowed to copy defendants' entire computer hard drive), this Court is inclined to disagree.   The information was not previously *inaccessible by the defendants*.  Puckett testified that the information was retrievable and that Sandy Thomas simply did not ask for it, as Sandy Thomas has admitted.  Plaintiffs were forced to incur great expense to obtain discovery that was readily available to the defendants.

Defendants argue that, if the plaintiffs had waited,[33] it is entirely possible that defendants might have been able to retrieve the information at no cost to the plaintiffs.  This argument is nonsensical in light of defendants' representations to this Court and the plaintiffs – *i.e.*,  that pre-Katrina computer generated records had been overwritten and data comprising pre-Katrina computer generated pay stub information was irretrievable in their own system's specialist's opinion.  Depositions of the defendants' manager and supervisors/foremen were imminent and plaintiffs' counsel was forced to incur the expert fees in order to access relevant information

---

[32]*See* Minute Entry Order dated February 16, 2006 at p. 2 ¶ 1 (reiterating defendants' representations to the Court regarding the availability of documentary and electronic data discovery critical to the plaintiff's prosecution of this action) (all emphasis added) [Rec. Doc. No. 102].

[33]Defendants sought to further delay computer data discovery arguing that their computer expert's wife was deathly ill and could not attend.  *See* Email Chain of Correspondence dated February 17, 2006 (which culminated in a telephone call to the Court on Friday evening/ 2-17-06) [Doc. # 145-2/Plaintiffs' Exhibit 41].

necessary to effectively depose crew leaders/supervisors *before* they departed the United States. Defendants' lack of diligence and failure to abide by their discovery obligations gave the plaintiffs' no choice but to incur the extraordinary expense of hiring a computer consulting firm to retrieve what was purportedly "irretrievable."

Addressing Express Forestry's contention that it is incapable of compelling or coordinating discovery depositions of four recently-departed supervisors/crew leaders because it has no way of contacting these individuals, plaintiffs highlight that: (1) no explanation was offered for defendants' failure to disclose the names of at least seven foremen who worked during the 2002-2005 time; and (2) Sandy Thomas (who claims to have absolutely no knowledge of the whereabouts of any former Express supervisors) was in fact capable of learning about Plaintiffs' independent communications with former supervisors abroad concerning the possibility of their depositions.[34]   The record further reflects that Employment Applications executed by H-2B workers contain the necessary contact information, including addresses, telephone contact numbers and emergency contact information for Express Forestry workers.[35]   Additionally, Express Forestry's Manager/Recruiter, Leo Salazar, testified that he has been responsible for hiring Guatemalan and Mexican H-2B workers for several years and maintains telephone contact

---

[34]*See* Second Declaration of Sandy Thomas dated June 20, 2006 at ¶ 10 ("Based upon information and belief, Defendants understand that Plaintiffs Counsel and/or agents have recently traveled to Mexico to meet a group of potential H-2B class members to encourage them to join this lawsuit against Defendants.  It is also the Defendants' understanding that Plaintiffs' Counsel were able to contact several former supervisors who all declined to be deposed for this litigation.") [Defendants' Exhibit 3].

[35]*See* Aplicacion dated December 10, 2004 executed by Pablo Recinos Alvarado [Plaintiffs' Exhibit 31].

18

with these workers, either via home telephone or  "casseta" (leaving a message).[36]   Despite the

fact that the defendant company is a small, "mom and pop" Arkansas-based, tree planting

company, it is clear on this record that when defendants need to locate former crew

leaders/workers they are fully capable of doing so.  Indeed, Salazar admitted that he records

contact information for most H-2B workers/recruits.  A key ingredient of the continued operation

of the defendants' seasonal tree planting business (which admittedly depends upon labor imported

labor/H-2B workers from Guatemala/Mexico)[37] is the Manager/Recruiter's (Salazar's) ability to

contact said seasonal workers during the off-season to secure workers for the following planting

season.

The Court now turns to defendants' argument that plaintiffs' renewed motion for

contempt/sanctions was not necessary and that plaintiffs are now in possession of *all* relevant

evidence that exists.  In this regard, defendants admit that they have had difficulty communicating

with plaintiffs, but suggest that: (1)  there is no evidence that they ever intentionally made

misstatements in an effort to confuse or hinder the plaintiffs; (2) all mistakes have been corrected;

and (3) they have prevented any prejudice by allowing plaintiffs' expert to copy Express

Forestry's entire hard drive.  Defendants argue that a party trying to hide computer data does not

allow the opponent to copy the entire hard disk drive.

As to the defendants' suggestion that they acceded to plaintiffs' request and allowed

---

[36]*See* Deposition of Leo Salazar at pp. 44-46 (stating that (1) everyone hired goes through him, (2)  workers contact his cell phone directly, (3) most of the time, he gets the workers' contact information and (4) he maintains a list of workers' contact numbers).

[37]*See* Declarations of Sandy and Rick Thomas at ¶ 3 [Rec. Doc. No.52].

electronic data discovery, the Court reiterates that it was court-ordered and born of necessity of defendants' making.  Defendants erroneously represented that relevant electronic data was *irretrievable.*  Understandably, plaintiffs pressed for the opportunity to test that obstacle in light of imminent deposition discovery of crew leaders (who would soon depart the United States).

 As to the lists of workers' names and contact information provided by defendants, the defendants contend that plaintiffs have failed to explain how it was deliberately incomplete. Defendants now argue, for the first time, that any additional workers plaintiffs discovered in the computer data are not H-2B workers and not potential class members.  In support of this explanation defendant Sandy Thomas coined a Second Declaration, representing that not all of Defendants' employees who have Hispanic surnames and gave Guatemalan or Mexican home addresses were hired through the H-2B program (for example " resident aliens" *with foreign addresses*).[38]

 This Court has scoured the record in vain, searching for some other reference to "resident aliens" swelling the ranks of defendants' work force.  Most notably, in opposition to plaintiff's motion for class certification, defendants did not raise the issue at all in their argument countering the plaintiffs' statistical evidence of numerosity.   More particularly, defendants did not urge the district judge to further discount the actual number of employees during their peak season in 2005 (*i.e.*, 108 employees) by the number of "resident alien"/non-H-2B employees on the workforce.[39] Additionally, it was represented to this Court that:

---

[38]*See* Second Declaration of Sandy Thomas at ¶ 8 [Rec. Doc. No. 134-3].

[39]*See* Defendants' Opposition to Plaintiff's Motion for Class Certification at p. 5 [Rec. Doc. No. 70].

"[Tree planting] is not the greatest job in the world.  We don't want to do it, so we let the Guatemalans do it.  However, from a Guatemalan's point of view, it is a very lucrative position.  It pays well by their standards, and they have done well financially because of these jobs.  And they have been able to build houses with two years worth of work instead of 20...."[40]

In addition, the testimony of defendants' manager, Leo Salazar, compels the opposite conclusion, *i.e.*, that the names of additional crew leaders discovered by plaintiffs are names of potential class plaintiffs/ H-2B workers imported from Mexico or Guatemala, which were erroneously excluded from discovery responses/lists provided by defendants.  Salazar testified that over the period of the last several years, all of the workers hired came from Mexico and Guatemala and were approved by him.  Salazar's practice was to provide the list of Guatemalan/Mexican workers to Sheryl Puckett, who would then talk to the embassy and make the appointments.  Thereafter, Salazar directed as many individuals as the company needed to attend the appointments at the embassy made by Puckett.[41]

As to prejudice, plaintiffs highlight that two of three former crew leaders/foremen not ever named by defendants in response to Interrogatory No. 4 have agreed to be deposed; however, because the plaintiffs had to ferret out the names of these foremen themselves, these depositions will have to be conducted abroad.  Therefore, defendants should have to pay the costs of these depositions in Guatemala, as well as the costs incurred in connection with any other foreman's deposition which must take place outside of this district.

By defendants' own admission, nearing the height of the Atlantic hurricane season,  they

---

[40]Transcript of November 30th, 2005 Proceedings before the undersigned Magistrate Judge at p. 58 [Doc. #125/Defendants' Exhibit 12].

[41]*See* Deposition of Leo Salazar at pp. 44-46.

transferred *all* of their only copies of critical employment records to a beach house on the Gulf Coast (600 miles from the company office in Arkansas).  This was accomplished only after having been placed on notice as to the importance of these documents by plaintiff's lawsuit and then, plaintiffs' July 28, 2005 Discovery Requests.   Accepting this story as true, defendants' negligent handling of the only copies of relevant responsive business documents with no back up copy is as sanctionable as would be any failure to preserve electronic data discovery by overwriting or otherwise corrupting it in the face of pending litigation.

At no time have the defendants' produced any relevant business record voluntarily.  All discovery *essential/critical* to the prosecution of the plaintiffs' claims has been produced pursuant to Court order, including electronic data discovery.  Having ordered same, defendants again attempted to delay the court-ordered electronic data discovery for several weeks due to the previously undisclosed unavailability of the defendants' computer expert .  This Court refused to permit any further delay.

To date, trial preparation has been accomplished only through plaintiffs' Herculean efforts bolstered by staccato motions to compel and a corresponding series of orders compelling production of responsive documents and/or information.

**ANALYSIS**

A litigant may be obliged to pay his opponent's expenses and fees if he resists or impedes discovery.[42]   Amazingly, defendants argue that plaintiffs have identified no information it did not produce.  As aforestated, all critical discovery documents/information was produced belatedly and

---

[42]Fed. R. Civ. P. 37.

pursuant to court order.   Defendants have continually flouted the orders of this Court and provided evasive, incomplete and, in certain instances, downright deceitful responses.  A fair reading of the docket sheet alone indicates that, by and large, plaintiffs accomplished the discovery task so far *on their own* by investing substantial time and money in discovery motion practice and finally, by hiring a computer expert to exact electronic data, which defendants erroneously insisted was irretrievable.  Plaintiffs moved as quickly as possible though daunted at every turn.  Now, most of the defendants' crew leaders/foremen have left the country.  Whether the product of intentional deceit or contumacious refusal to seriously comply with their discovery obligations, the havoc wreaked with respect to trial preparations is the same.   There is little question but that defendants' subterfuge is sanctionable.

Courts govern their own affairs.[43]  When parties exploit the judicial process, a court may even sanction conduct beyond the reach of other rules.[44]   When a party engages in sanctionable conduct, the court may shift the entirety of an aggrieved party's expenses to the offending party.[45]  Short of outright spoliation of evidence and intentional misrepresentation, it is hard to conceive how much more egregious the defendants' conduct should have to be to merit the imposition of sanctions.   The defendants made no effort whatsoever to locate and provide either documentary or

[43]U.S. Const., art. III, § 2, cls. 1, 2; *United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812); *Chambers v. NASCO*, 501 U.S. 32, 42-45 (1991).

[44]*Chambers*, 501 U.S. at 50; *Natural Gas Pipeline v. Energy Gathering*, Inc., 2 F.3d 1397, 1407 (5th Cir.1993); *Clark*, 2004 WL 635585, 93 Fed.Appx. 643, 652 (5th Cir. 2004).

[45]*Chambers,* 501 U.S. at 58.

electronic data discovery which was at all times available or to formulate answers responsive to plaintiffs' discovery requests.

To support sanctions, the court must articulate (a) the conduct that generates the sanction, (b) the costs that the conduct caused, (c) the reasonableness of the costs, and *(d) the least severe sanction to achieve the purpose of the rule under which it was imposed.*[46]  Although much of defendants' conduct discussed above at length merits punishment, the sanctions ordered below are only imposed for the purpose of equitably adjusting the burden of this case, which has been skewed to the plaintiffs' prejudice/detriment by defendants' ignorance (willful blindness) of their discovery obligations, notwithstanding many orders compelling discovery.

Defendants' failure to cooperate with the discovery effort described in great detail in this Court's findings above is objectively ascertainable.   Delayed production of responsive written discovery at each opportunity and responses only pursuant to Court order, if then (*i.e.*, contempt), effectively thwarted the possibility of conducting meaningful depositions of defendants' supervising foremen while they remained in the United States.  Defendants' documented lack of diligence in producing meaningful discovery has indeed obstructed plaintiffs' prosecution of their case.

Absent defendants' complete lack of effort in attempting to locate, identify and produce relevant discovery in their possession and control [which was not destroyed by Hurricane Katrina], it is highly likely that plaintiffs' would not be faced with incurring the expense entailed in tracking

---

[46]*Topalian v. Ehrman*, 3 F.3d 931, 937 (5th Cir.1993).

24

down supervising crew foremen and conducting deposition discovery abroad.  Absent defendants'

sanctionable conduct, all crew leaders' depositions may well have been conducted either in this

district or some other venue *in the United States*.  In this regard, although the difference in cost

between deposition discovery conducted in the United States and abroad  is  not presently

ascertainable, defendants shall be ordered to pay the additional expense incurred in conducting

such deposition discovery abroad, if and when it is accomplished.  Sanctions approximating the

difference in the cost of deposition discovery conducted in the United States and deposition

discovery abroad are reasonable.  Plaintiffs' counsel shall keep record of these expenses and, at the

close of deposition discovery, make application to this Court for *additional* fees/expenses incurred

in conducting deposition discovery in Guatemala and Mexico.


     Defendants' sanctionable conduct has also caused the needless escalation of expenses

incurred by plaintiffs in prosecuting three motions to compel,  two of which included requests for

sanctions/contempt.  In addition to attorneys' fees, expert costs were necessarily incurred to obtain

relevant discovery which was at all times available but not produced by defendants.

     Plaintiffs are therefore entitled to reimbursement for such costs incurred as sanctions for

contempt, in addition to reasonable attorneys fees incurred (1) in preparing this motion, (2)

preparing for the prior motions for contempt and/or discovery and  (3) supervising plaintiffs'

expert's examination of the defendants' computer system.  Inasmuch as it is not clear whether

crew foremen's depositions, which have already been taken, need be revisited in light of the

belated production of documentary discovery, the Court reserves the plaintiffs' right to request

these additional costs in the event that any of these individuals are in fact re-deposed.

This Court has reviewed plaintiffs' counsels' itemization of costs/fees incurred. Having exercised billing judgment (10% across the board cut of all hours billed by Kristi Graunke on the three separate discovery motions) and having eliminated time not optimally spent, plaintiffs' incurred reasonable fees and costs totaling **$36,391.24**. These costs/fees were incurred attempting to exact relevant discovery, which was at all times in defendants' possession and control, but not produced.

Based upon defendants' representations that all of their records were destroyed by the storm and that corresponding electronic data was irretrievable, plaintiffs' incurred the expense of a computer expert to analyze defendants' computer records and tease out information which defendants failed to provide because of their own lack of diligence. The total cost of computer expert services incurred by plaintiff amounted to **$9,544.24**, which is included in the aforesaid total figure.[47]

Plaintiffs refer the Court to the hundreds of pages of memoranda and exhibits addressing the above discussed discovery issues, including numerous hearings (in court and by telephone) all aimed at compelling defendants' compliance with their discovery obligations. Having reviewed the record in its entirety, the undersigned Magistrate Judge is not persuaded by defendants' argument that any one of the plaintiffs' three motions to compel and/or for sanctions were unnecessary. This time was well spent and plaintiffs' extraordinary discovery efforts were occasioned by the defendants' lackadaisical approach and/or subterfuge. The discovery process in

---

[47]*See* Notice of Filing Documentation of Attorneys' Fees and Costs filed July 3, 2006 and attachments [Rec. Doc. No. 148-1 through 148-7].

this case has proved to be nothing less than a monumental chore for counsel and the Court.  Hardly the usual fare, this case involved multiple motions, multiple briefing schedules,  multiple hearings and corresponding rulings with written reasons.

A serious commitment of time was necessary to meet the rigors of the serial discovery motions.   Plaintiffs ultimately prevailed on their claims that defendants have thwarted the discovery effort at every turn.  Utilizing the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, (5th Cir. 1974) (the lodestar method), this Court's review of plaintiffs' counsels' documentation reveals that the amount of fees and costs  they seek to recoup ($36,391.24) are reasonable.

This Court will not reiterate the time chart detailing the hours dedicated to plaintiffs' discovery efforts, which is incorporated herein it by reference. *See* Plaintiffs' Notification Regarding Fees/Costs  [Rec. Doc. No. 148].  This Court has been given no reason to doubt that the hourly rates (*i.e.*, $250.00(MB)/$175.00 (KG)/$100.00(JP) an hour) are consistent with counsels' ability, competence, experience, and skill.  Moreover, considering the prevailing market rates in this district, the aforesaid hourly rates cannot be characterized as unreasonable.

This Court has reviewed the docket sheet, the record and the contemporaneous time records submitted by plaintiffs' counsel and does not find that there are any instances of failure to exercise billing judgment or failure to excise unproductive time.   Considering the lengths to which plaintiffs have been compelled to travel to exact discovery responsive to the claims, this Court is not inclined to further discount plaintiffs' counsel's fees.

The court must consider whether the lodestar should be adjusted upward or downward, depending on the circumstances of the case and the factors set forth in *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714 (5th Cir.1974).  The twelve factors are: (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19.

The court's analysis need not be meticulously detailed; however, it must discuss whether applicable *Johnson* criteria require any upward or downward revision to the lodestar.  To the extent that any of the *Johnson* factors apply in this case, this Court specifically finds that they are subsumed in the lodestar.  Accordingly, they should not be reconsidered when determining whether an adjustment to the lodestar is required.  The most critical factor in determining the reasonableness of an attorney's fee award "is the degree of success [or result] obtained." *Hensley*, 461 U.S. at 436.[48]  As aforestated, plaintiffs have sufficiently demonstrated that billing judgment was exercised and unnecessary time excised, so that the lodestar reflects the number of hours reasonably expended on pre-trial discovery/motion practice.

---

[48]S*ee also Giles v. General Elec. Co.*, 245 F.3d 474, 491 n. 31 (5th Cir.2001) (stating that the most important factor under the *Johnson* analysis is the result obtained);  *Migis*, 135 F.3d at 1047.

This court has fully considered the application at issue in light of the teachings in *Hensley*, *supra*, and its progeny, and determined that no adjustment (upward or downward) is appropriate considering that all appropriate and applicable factors are subsumed in the lodestar computation.

Accordingly and for all of the aforesaid reasons, the Court issues the following orders, to wit:

**IT IS ORDERED** that Plaintiffs' Renewed Motion for Contempt/Sanctions [Rec. Doc. No. 125] is GRANTED IN PART as set forth below, to wit:

(1) The imposition of monetary sanctions against defendants (Express Forestry, Inc., Rick Thomas and Sandy Thomas) in the amount of **$ 36,391.24** is warranted, representing reasonable attorneys' fees plus expenses necessarily incurred in prosecuting three motions to compel and exacting electronic data from defendants' computer files.

(2) Defendants shall pay the aforesaid amount to plaintiffs' counsel forthwith and in no event later than thirty (30) days from the date of the entry of this order.

(3) As aforestated, the Court fully reserves plaintiffs' right to make application to this Court for additional fees/costs incurred in conducting deposition discovery abroad, if and when such formal discovery abroad is accomplished.  In this regard, the defendants shall be afforded the opportunity to respond to any such application.  The measure of any such sanctions relative to foreign deposition discovery made necessary by the defendants' failure to comply with their discovery obligations shall be the *additional* cost/fees incurred  in conducting said depositions abroad as opposed to within the continental United States.

New Orleans, Louisiana this 11th day of August, 2006.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**