UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **HUGO MARTIN RECINOS-RECINOS, ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 05-1355** |
| **EXPRESS FORESTRY, INC., ET AL** | **SECTION "I" (3)** |

### REPORT AND RECOMMENDATION

Pursuant to the reference of the district judge,[1] the matter of Plaintiffs' Motion to Enforce Settlement #225 and Defendants' Cross-Motion for Protective Order # 247 came on for evidentiary hearing before the undersigned Magistrate Judge.[2] Following the hearing, the matter was taken under advisement. For the following reasons, **IT IS RECOMMENDED** that Plaintiffs' MOTION TO ENFORCE #225 be GRANTED and Defendant's Cross-Motion for Protective Order #247 be DENIED.

### I. BACKGROUND

On April 7, 2005, class representatives, Hugo Martin Recinos-Recinos, Pablo Alvarado-Recinos and Alberto Alvarado, filed the captioned class action lawsuit. The collective/class action alleges that during the plaintiffs' and putative class members' employment with Defendants, Express Forestry, Inc., Rick Thomas and Sandy Thomas, they systematically violated the Agricultural Worker Protection Act (AWPA), 29 U.S.C. § 1801, and the Fair Labor Standards Act (FLSA), 29 U.S.C. §201. The action was brought on behalf of a class of over 300 predominantly Guatemalan and Mexican migrant workers who planted trees and performed other

---

[1]*See* Order of Reference dated January 22, 2008 [Doc. # 234].

[2]*See* Minute Entry dated March 17, 2008 [Doc. # 246].

forestry-related tasks for the defendants seasonal business.

Plaintiffs' AWPA claims are based on their employment in defendants' forestry operations. The AWPA claims alleged include: (1) that defendants failed to timely furnish plaintiffs with written disclosures pursuant to 29 U.S.C. § 1821(a); (2) that defendants knowingly provided false and misleading information about the terms and conditions of employment pursuant to 29 U.S.C. § 1821(f); (3) that defendants failed to make, keep, and preserve accurate records concerning plaintiffs' employment pursuant to 29 U.S.C. § 1821(d)(1); (4) that defendants failed to furnish accurate records to employees each pay period pursuant to 29 U.S.C. § 1821(d)(2); and (5) that defendants imposed a void term and condition of employment purporting to waive or modify plaintiffs' rights under the AWPA pursuant to 29 U.S.C. § 1856.[3]

With respect to their FLSA action, plaintiffs claimed that they and similarly situated H-2B workers were not paid the federal minimum wage for all hours worked, that they were not paid for time waiting and preparatory work, and that they were paid by piece, *i.e.*, for each tree planted, rather than by the hour. Plaintiffs identify a class of all non-supervisory workers admitted as H-2B temporary foreign workers who were employed by defendants between April, 2002, and the present.[4]

On May 11, 2007, the district judge issued its order approving final settlement between the Certified Class of H-2B Workers and defendant forestry labor contractors, *i.e.*, Sandy

---

[3] *See Recinos-Recinos v. Express Forestry, Inc.,* 233 F.R.D. 472, 483 (E. D. La. Jan. 30, 2006) (Africk, J.).

[4] *Id.,* at 475.

Thomas, Rick Thomas and Express Forestry, Inc. Plaintiff class asserted violation of the Migrant and Seasonal Agricultural Worker Protection Act (AWPA) and the Fair Labor Standards Act (FLSA).[5] In the instant Motion for Contempt and to Enforce, Class Plaintiffs cite various provisions of the settlement agreement discussed below and urge the Court to find the defendant forestry labor contractors in contempt.

## II. SETTLEMENT AGREEMENT PROVISIONS AT ISSUE

As part of the Court's approval of the Settlement Agreement, the district judge entered an injunction under AWPA ordering the defendants to pay workers complete and appropriate wages when due and comply with the working arrangements made between the parties.[6] Defendants also agreed to refrain from requiring workers to either temporarily or permanently surrender passports, visas and other identification documents to the defendants or any of their employees or agents.[7] Defendants further agreed to make certain disclosures to their workers, including an anti-retaliation notice that was to be provided to plaintiff's counsel in the worker's native language for editing and review prior to distribution to the workers.[8] Defendants pledged to comply with AWPA and FLSA and "any other applicable laws in their employment with any and all workers."[9]

## III. DISCUSSION OF ALLEGED VIOLATIONS

Addressing the alleged records keeping and pay violations, the record reflects that a

---

[5] Final Order Approving Settlement dated May 11, 2008 [Doc. #223].

[6] *See* Settlement Agreement, Section IV, ¶ 19 a-k (injunctive relief) [Doc. #216-2].

[7] *Id*. at Section V, ¶ 27 (agreement regarding collateral and document holding) [Doc. #216-2]

[8] *Id*. at Section V, ¶ 22 (agreement not to retaliate) [Doc. #216-2].

[9] *Id*. at Section III, ¶ 18 (contractual agreement to comply with federal law) [Doc. #216-2].

number of H2-B worker were not paid for the final weeks of work in the 2006-07 forestry season despite counsel's request, including: Jesus Jimenez-Alvarado, Bacilio Jimenez-Alvarado, German Otoniel Lopez-Lopez and Ogden Fernando Lopez-Recinos and Heduar Barrios-Leiva.  Indeed, Lopez-Lopez and Lopez-Recinos have not received a single paycheck for their work during the 2006-07 forestry season.  Sandy Thomass explanation was that paychecks due employees after they quit were sent to the address given on the I-9 form (permanent address abroad).

Plaintiffs attempts to resolve these issues with defendants were unsuccessful.  Pursuant to the hearing and considering the documents of record, it is clear that inadequate and inaccurate records of employee addresses maintained by the defendants greatly hampers their ability to comply with their obligation under the applicable law and the settlement agreement *to effectuate payment as required*.  Indeed, Rick Thomas testified that final paychecks are mailed to the workers' home addresses and some are not negotiated.  He further testified that the checks are not re-issued. Moreover, defendants retain the full value of the uncashed paychecks.  Claims of late payment and non-payment made by H-2B workers for the period of the 2006-2007 forestry season are subsumed in the Settlement Agreement.  However, any claim for non-payment or late payment of any class members for the 2007-2008 forestry season are actionable, whether said H-2B worker formerly worked during the 2006-2007 forestry season or not.

In this regard, the Court can only conclude that the defendant's method of paying the H-2B workers *via inaccurate foreign address* and utilizing an unreliable foreign postal system, whether calculated to circumvent their obligations under the Settlement Agreement or not, results in the defendants' retention of foreign worker's 2007-2008 season's cash wages in violation of the Agreement.[10]  Plaintiffs' audit of payroll records relating to Express Forestry's 2007-2008 workforce revealed that  H-2B workers were not issued their first paychecks until almost a month

---

[10]*See* Affidavit of Gabriella Maxcy dated December 21, 2007 [Plaintiff's Exhibit 19].

4

after they commenced working for Express Forestry. Sandy Thomas testified that the workers were provided $50.00 "advances" during the first four weeks. H-2B workers thus did not receive their first paycheck and travel reimbursements as mandated under the settlement agreement. The Declarations of Meredith Cabell dated March 13, 2008 detailing her audit results of Express Forestry's pay records are uncontroverted. The record reveals that, even after the initial four-week pay period, workers were not paid in a timely fashion at the end of each two-week pay period.[11]

The FLSA was enacted to "eliminate low wages and long hours" and to "free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers." 29 U.S.C. § 201*; see Brennan v. Veterans Cleaning Service, Inc.*, 482 F.2d 1362, 1368 (5th Cir.1973). The FLSA established a minimum wage, regulations concerning maximum hours, record keeping and reporting requirements, child labor provisions, and a system of civil and criminal penalties for violation of its provisions. 29 U.S.C. § 201, *et seq*. Amended in 1966 to extend its minimum wage protections to some agricultural workers (*see* S. REP. No. 89-1487 (1966), reprinted in 1966 U.S.C.C.A.N. 3002), the FLSA requires payment "in cash or negotiable instrument payable at par." 29 C.F.R. § 531.27(a).

For its part, AWPA requires compliance with the terms and conditions of employment at the time of recruitment and payment of wages owed when due. 29 U.S.C. § 1822(a), ( c ). It is well-settled that AWPA is remedial in nature and must be construed broadly to effect its humanitarian purpose. *See Caro-Galvan v. Curtis Richardson, Inc.,* 993 F.2d 1500, 1505 (11th Cir.1993) ("AWPA is a remedial statute and should be construed broadly to effect its

---

[11]*See* Declaration of Meredith Cabell dated March 13, 2008 (noting audit results including that first paychecks were issued 3 weeks to 4 weeks after the commencement of work to H-2B workers, thereafter, the majority of bi-weekly paychecks issued at least eleven (11) days after each pay period concluded) [Plaintiff's Exh. 26].

5

humanitarian purpose."); *Bracamontes v. Weyerhaeuser Co.*, 840 F.2d 271, 276 (5th Cir.1988) (persuaded by the remedial purposes of the Act and the difficulties of migrant workers planting trees, the Court construing the Migrant and Seasonal Agricultural Worker Protection Act (MSPA) broadly ).

The Court-ordered injunction entered in this case pursuant to AWPA mandates that defendants pay H-2B workers proper wages when due and abide by the terms of any applicable working arrangements. *See* Agreement ¶ 19 [Plaintiffs' Exh. "1"].  Defendant's inadequate records-keeping, systematic late payment and any failure to provide 2007-2008 any seasonal H-2B  workers their final paychecks violates AWPA, the FLSA and the Settlement Agreement.[12]

Defendants are also in violation of ¶ 19(h) of the Settlement Agreement, which provides:

> From the date that the District Court of the Eastern District of Louisiana decides the *Arriaga v. Fla. Pac. Farms,* 305 F.3d 1228 (11th Cir.  2002) issues, the Defendants will abide by that decision as to the payment or reimbursement of the travel and visa expenses incurred by each migrant and seasonal worker for all workers hired thereafter.  In the event that the District Court does not rule on the merits of the *Arriaga* issue by June 30, 2007, the defendants will abide by the *Arriaga* decision until the District Court or the Fifth Circuit Court of Appeals rules otherwise.   Settlement Agreement at ¶ 19(h).

The *Arriaga* court held that guest workers' out-of-pocket expenses for visas and travel from guest workers' home villages to the employer's operations in the United States functioned as *de facto* deductions from the worker's first paychecks for the purposes of the FLSA.  *Arriaga,* 305 F.3d at 1237-44.  The court required reimbursement of the guest workers' out-of-pocket expenses necessarily incurred in travel to the U.S. worksite to the extent necessary to ensure that workers make minimum wage for each hour worked, free and clear of any improper *de facto* or actual deductions.  *See id.*; *see also Castellanos-Contreras v. Decatur Hotels, LLC*, 488 F. Supp. 2d 565, 572 & n. 5 (E. D. La. 2007) (Fallon, J.) (noting that, "in light of its conclusion that the

---

[12]*See* Declaration of Meredith Cabell dated March 13, 2008 [Plaintiff's Exh. 26].

FLSA applies in the H-2B context, *Arriaga* and its progeny of H-2A cases become extremely relevant precedent").

Defendants' payroll records demonstrate that all Mexican workers are reimbursed $100.00 in travel expenses and that all Guatemalan workers are uniformly reimbursed $354.00 in travel expenses. Defendants attempted to explain the "one price fits all" anomaly for the Mexican workers based upon the fact that all of their Mexican workers come from Nuevo Laredo. There was no explanation for the uniform reimbursement of $354.00 for all Guatemalan H-2B workers, except that Express Forestry's contact person in Guatemala – *i.e.*, an attorney named Anna Maria – informed the Defendants that $354.00 was the cost of the Guatemalan workers' flight. Suffice it to say, the workers are not compensated for travel from their respective villages to the international airport in Guatemala pursuant to the applicable law.

Records reflect that uniform deductions of $40.00 to $50.00 per week were charged each worker for transportation expenses ("personal rides") – *i.e.*, transport in a 15-person van. Defendants failed to substantiate that they are charging a reasonable price for this facility. Indeed, records reveal that the defendants deduct $200.00 for four weeks of rides from Guatemalan workers' paychecks, whereas $80.00 for two weeks of rides are deducted from the Mexican workers' paychecks.[13] Plaintiffs contend that the "personal ride" charges deducted from the H-2B workers' first four weeks wages are a thinly disguised effort by Defendants to retain a substantial portion of the *Arriaga* reimbursement, even before the H-2B worker ever receives it. Indeed, no logical explanation was provided for the cost of transportation skew *vis a vis* Mexican

---

[13]*See* Paystub Information in case of Guatemalan worker Moise for the pay period 10-29-07 through 11/18/07(noting a $200.00 ride deduction) [Plaintiff's Exhibit 27 in globo]; Paystub Information in case of Mexican worker Etazel (noting $50.00 advances as opposed to pay during the first few pay periods and an $80.00 ride deduction for the first two week period) [Plaintiff's Exhibits 28 and 29 in globo]; Paystub Information in case of Guatemalan worker Julio and Mexican worker Orozco, inter alia (noting a singular ride deduction for each in the amounts of $200.00 and $80.00 respectively) [Plaintiff's Exhibit 30 *in globo*].

and Guatemalan workers.

29 C.F.R. § 531.3 provides that the "reasonable cost" is "not more than the actual cost to the employer of board, lodging, or other facilities customarily furnished by him to his employees," meaning that it cannot include a profit. The unexplained cost differential between that charged to Mexican workers ($80.00) and that charged Guatemalan workers ($200.00) for "personal rides"[14] admits but one conclusion and that is that the aforesaid deductions do not constitute "reasonable cost" for the facility provided by the employer within the meaning of the aforesaid applicable federal regulation.

Moreover, the Court is convinced that the "personal ride" deduction charged only during the first four weeks of work at $50.00 per week for Guatemalan workers for a total of $200.00 is a device which is utilized by the defendants to offset said workers' $454.00 *Arriaga* reimbursement ($354.00 flight + $100.00 visa). The same is true for the Mexican workers,' whose *Arriaga* reimbursement would amount to the lesser amount of $200.00 ($100.00 bus fare from Nuevo Laredo, Mexico + $100.00 visa). The $80.00 "personal ride" deduction applied by Express Forestry to Mexican workers' first two-week pay period only is obviously a sham – *i.e.*, an attempt to disguise an otherwise unlawful payroll deduction. Inexplicably, after the first month on the job, neither the Mexican workers' nor the Guatemalan workers' pay is reduced to account for the provision of any "personal rides" by Express Forestry.

The Court is also persuaded that the practice of collecting recruiting fees persists. Defendants' agents abroad require, as a precondition for seasonal hire, an advanced deposit for four weeks' worth of food and lodging. Plaintiffs' counsel's paralegal polled the Defendants' list

---

[14]*See* Express Forestry, Inc.'s Work Contract for the period of 10/1/08-8/1/08 at ¶ 7 entitled "Deductions" (noting as a precondition to employment that the "Worker agrees to a weekly deduction of fifty (50) dollars from his paycheck for personal trips in the Company vehicle," inter alia) [Plaintiff's Exh. 31].

8

of hotels where workers were lodged during the 2007-2008 forestry season.  The results were that the vast majority required no deposit and only a few establishments required a nominal deposit (*i.e.*, the cost of one night's lodging in advance).[15]  Rick Thomas admitted that the worker's advanced deposits were not provided by the worker to the hotel but rather to himself.  Plaintiffs correctly note that, even if these hotels did in fact require four weeks' worth of advance deposits from each of the workers, the Settlement Agreement clearly provides that such required payments (advance deposit for lodging) must be made directly to the hotel and not to Defendants and their agents.  *See* Settlement Agreement at ¶ 27 ("This restriction shall not apply to security deposits or prepayments that are required by a hotel or other place of lodging where H-2B workers are to stay while they are performing work for the Defendants, *so long as these payments are made to the hotel.*").

In sum, the undersigned Magistrate Judge is convinced that Express Forestry's recruiting bosses are now disguising their hefty recruiting fees ($400.00) as "advance deposits for lodging." These advanced deposits are preconditions which must be met in order to be hired for seasonal work by the Defendants.[16]  The undersigned Magistrate Judge is persuaded that the Defendants have no legitimate purpose in requiring hundreds of dollars in advance to secure food and lodging, much less any good reason to make such a large advance deposit a precondition of seasonal employment.  As aforestated, the hotels utilized by the Defendants to house workers during the forestry season typically require no advance deposit whatsoever.

The Settlement Agreement holds the defendants fully liable for prospective compliance

---

[15]*See* Declaration of Jan Lanier dated March 12, 2008 [Plaintiffs' Exhibit 33].

[16]*See* Declaration of Bonafacio Lira Acosta dated March 12, 2008 at ¶ 10 (stating that to work the 2007-2008 forestry season he was required to pay $550.00 in advance for food and lodging but, because he did not have the money, there was no work for him with Express Forestry) [Plaintiffs' Exh. 32].

with the FLSA and AWPA.  The Settlement Agreement does not, as the defendants argue, give them a free pass to violate the law with respect to any employees whose past pay problems were covered under the November 30, 2006 Settlement Agreement, which received final approval by the district judge on May 11, 2007.[17]

Defendant's disclosures and time cards restrict workers from asserting their rights under the settlement agreement.  Workers must agree to refrain from supporting or consenting to any claim against the Employer, a crew leader or officials for any wrong, contractual claim or regulatory infraction except by means of binding arbitration provided for in the work contract.[18] The Court has retained jurisdiction to enforce the settlement agreement until May 2010 and there is an injunction directing Defendants to comply with AWPA.  The various contractual provisions are directly at odds with the anti-retaliation provision of AWPA and this Court's continuing jurisdiction to enforce the Settlement Agreement.   The fact that the "Arbitration" clause at the end of Express Forestry's Work Contract provides an exception is confusing at best.[19]  It is also problematic that the Defendants' utilize time cards which Express Forestry requires each worker to sign and therein attest that all the rules have been followed and that they have worked no

---

[17]*See* Order dated May 11, 2007 (granting final approval of the Motion for Final Approval of Calls Action Settlement) [Doc. # 223].

[18]*See* Express Forestry, Inc. Work Contract for the period of 10/1/2008 to 8/1/2008 at ¶¶ 1, 2, 8 (detailing consideration of "mutual covenants," including that "the Worker is to remain loyal and will not be involved in competitive business activities and *otherwise will not be involved in activities damaging to the Company"* and a restrictive agreement that the worker will not "[c]ontinue, support, consent to any claim, charge, complaint or lawsuit in any forum, agency or court of justice against the Employer, its Crew Leaders ... for any supposed wrong ... except by means of arbitration") (italicized emphasis added) [Plaintiff's Exhibit 31].

[19]*See id.* at ¶ 16, the *last* paragraph entitled "Arbitration" ("Except to the degree that an infraction or anything considered an infraction of this Contract could subject to injunctive relief by court order, any dispute regarding applicability or enforceability of this Contract ... will be submitted to binding arbitration....").

10

overtime.[20]

Turning to the Defendant's counter accusations – Defendant's Motion for Protective Order and Request for Attorney's fees – both are without merit and interposed as an attempt to distract the Court from its duty to enforce the Settlement Agreement.  The Court is not persuaded by the defendants' complaint about "needless rabble rousing" in Georgia which purportedly convinced two unidentified H-2B workers to quit.  Plaintiff's counsel testimony was credible and the meeting at issue involved one attorney for the plaintiffs and a paralegal.  They visited the Defendants' employees after work hours in their Dawson, Georgia motel room during the tree planting.  The purpose of their visit was to inform the Defendants' H-2B workers about the protections and terms of the Settlement Agreement, the availability of class funds under the Agreement and the legal rights of migrant agricultural workers in general.

As the plaintiffs' aptly point out, such workers have the absolute right to speak with Plaintiffs' counsel and to quit their jobs if they so desire.  Moreover, the Settlement Agreement explicitly contemplates that Plaintiffs' counsel will have the opportunity to speak with the Defendants' employees in order to monitor compliance and notify class members about relief available under the Agreement.  *See* Agreement ¶¶ 13, 31(a).

Defendants' statement that "Express Forestry is making every effort to comply with the Settlement Agreement"[21] is not convincing in light of the foregoing.  The policies adopted by the Defendants, including hiring a bilingual secretary, having the workers sign a weekly time card certifying that no overtime hours are worked and equipping Express Forestry vehicles with

---

[20]*See* Express Forestry Time Card for Ortiz for the week of 12/24/07-12/30/07 [Plaintiffs' Exh. 34].

[21]*See* Defendants' Opposition to Plaintiffs' Motion for Contempt and to Enforce Settlement Agreement at p. 4 [Doc. # 237]; Defendants' Motion for Protective Order at Exhibit 5 [Doc. # 247].

tamper proof "GPS" units which record stop and start times for 15-person Express Forestry transport vehicles have not served to curb the violations which are the subject of the Court's injunctive decree.  Moreover, Defendants' statement that "all workers are reimbursed the cost of the inbound transportation from their country to the United States"[22] is belied by the Defendants' mandatory "personal ride" deduction which is charged discriminately to Mexican and Guatemalan H-2B workers, respectively at $80.00 and $200.00, and deducted from their first two paychecks, prior to their receipt of any *Arriaga* reimbursement.  Additionally, whereas the Defendants did in fact correct the mistake of not presenting the anti-retaliation notice mandated by the Settlement Agreement prior to the hearing of this matter, other provisions in Express Forestry's work contract discussed hereinabove work at cross-purposes with the aforesaid mandated *anti*-retaliation notice.

Accordingly, considering all of the parties written submissions and the testimony adduced at the evidentiary hearing conducted in this matter, and for all of the above and foregoing reasons,

**IT IS RECOMMENDED** that Plaintiff's Motion to Enforce be GRANTED in the following particulars, to wit:

1. Defendants be ordered to provide full compensation for all members of the 2007-2008 workforce for any transportation deductions taken plus an equal amount in liquidated damages.

2. Defendants be ordered to refrain from making future deductions for transportation.

3. Defendants be ordered to supplement the *Arriaga* reimbursements in quantities necessary to fully compensate the H-2B workers actual costs of travel from their hometowns in Guatemala and Mexico.

---

[22]*See* Defendants' Opposition to Plaintiffs' Motion for Contempt and to Enforce Settlement Agreement at p. 6 [Doc. # 237]; Defendants' Motion for Protective Order at Exhibit 5/p. 6 [Doc. # 247].

4.  Defendants be ordered to reimburse the workers for all recruitment and other fees that defendants' current or former employees charged to workers in the **2007-2008** forestry season as a prerequisite for obtaining employment.

5.  Defendants be ordered (A) to prepare a notice informing employees of the problematic contractual language quoted hereinabove which is improper in light of the FLSA's and AWPA's anti-retaliation provisions and (B) to remove from workers' time cards all language which indicates that the employees are responsible for controlling and recording their own hours of work, since it is clear from the deposition testimony submitted that crew leaders control all movements, stops, start and travel of the 15-person Express Forestry crew transport vans.

6.  Defendants be ordered to submit to limited discovery to further probe the veracity and accuracy of the defendants' pay and time records.

7.  Defendants be ordered to pay Plaintiffs' counsels' reasonable attorney's fees and expenses incurred in connection with prosecuting the instant Motion to Enforce and For Contempt.

**IT IS FURTHER RECOMMENDED** that the defendant's Motion for Protective Order and Sanctions #247 be DENIED.

New Orleans, Louisiana, this <u>19th</u> day August, 2008.

*[signature: Daniel E. Knowles, III]*

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**